*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

GROENEVELD TRANSPORT EFFICIENCY, INC.,
        *Plaintiff-Appellee/Cross-Appellant*,

*v.*

LUBECORE INTERNATIONAL, INC.,
        *Defendant-Appellant/Cross-Appellee*.

Nos. 12-3545/3576

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-00702—Donald C. Nugent, District Judge.

Argued: June 19, 2013

Decided and Filed:  September 12, 2013

Before:  GILMAN, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas L. Anastos, ULMER & BERNE LLP, Cleveland, Ohio, for Appellant/Cross-Appellee. Deborah J. Michelson, MILLER GOLER FAEGES LAPINE LLP, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Thomas L. Anastos, Melissa L. Zujkowski, ULMER & BERNE LLP, Cleveland, Ohio, for Appellant/Cross-Appellee.  Deborah J. Michelson, Steven J. Miller, David A. Kunselman, MILLER GOLER FAEGES LAPINE LLP, Cleveland, Ohio, for Appellee/Cross-Appellant. Kenneth B. Germain, WOOD HERRON & EVANS LLP, Cincinnati, Ohio, for Amicus Curiae.

        GILMAN, J., delivered the opinion of the court, in which GRIFFIN, J., joined. WHITE, J. (pp. 36–61), delivered a separate dissenting opinion.

1

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  The key issue in this case is whether a company can use trade-dress law to protect its functional product design from competition with a "copycat" design made by another company where there is no reasonable likelihood that consumers would confuse the two companies' products as emanating from a single source.  We hold that it cannot.  In so holding, we reaffirm that trademark law is designed to promote brand recognition, not to insulate product manufacturers from lawful competition.

Groeneveld Transport Efficiency, Inc. sued Lubecore International, Inc., claiming that Lubecore's automotive grease pump is a "virtually identical" copy of Groeneveld's automotive grease pump.  The complaint asserts that such copying constitutes trade-dress infringement in violation of § 43(a) of the Lanham (Trademark) Act, 15 U.S.C. § 1125(a), and further violates a number of related federal and Ohio laws.  All the claims except trade-dress infringement were dismissed when the district court granted Lubecore's motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  The trade-dress claim went to the jury, which found for Groeneveld and awarded it $1,225,000 in damages.

Lubecore appeals the denial of its Rule 50 motion with respect to the trade-dress claim.  Groeneveld in turn cross-appeals from the dismissal of its other claims.  For the reasons set forth below, we **REVERSE** the judgment of the district court denying Lubecore's Rule 50 motion with respect to Groeneveld's trade-dress claim, **AFFIRM** the district court's dismissal of Groeneveld's other claims, and **REMAND** the case with instructions to enter judgment as a matter of law in favor of Lubecore on all claims.

# I. BACKGROUND

## A. Factual background

This case, like many trademark cases before it, is a contest between an oldtimer and a newcomer. Their battle is over a relatively obscure product—the grease pump used in an automated lubrication system (ALS) for commercial trucks. An ALS, as the name implies, is a system for delivering a controlled amount of lubricant to different parts of a machine (in this case a commercial truck) while the machine is in operation. Automated lubrication saves time, increases operational efficiency, and minimizes corrosion by obviating the need for frequent manual lubrication. The primary component of an ALS is a grease pump that forces grease through injectors and hoses to targeted areas at timed intervals.

Groeneveld is the American branch of a Dutch company that has been in the ALS business for over 40 years. It began marketing the grease pump at issue in the present case—designated by Groeneveld as its EP0 pump—in the 1980s. The Groeneveld family of companies employs thousands of people and has a well-established international presence.

Lubecore, by contrast, is the new kid on the block. It was founded in 2007 by Jan Eisses, who had previously sold another company of his to Groeneveld and had been a Groeneveld employee for approximately three years. Lubecore is located in Canada, is owned by Eisses and his wife, and employed 12 people at the time of pretrial discovery. It designed the grease pump at issue in this case in December 2007 and began selling it first in Canada (starting in April 2008) and then in the United States (starting in March 2009). The two companies' competing grease pumps are shown below:



## B. Procedural background

In April 2010, Groeneveld brought suit against Lubecore in the United States District Court for the Northern District of Ohio. The complaint alleged that Lubecore was marketing a grease pump that was "virtually identical" to Groeneveld's pump with the intent to confuse consumers into believing that the two pumps were made by the same company, thus freeriding on Groeneveld's established goodwill by passing off Lubecore pumps as Groeneveld pumps. Groeneveld further alleged that, of all competing manufacturers, only Lubecore made a pump that had essentially the same design as Groeneveld's.

The complaint asserted six claims against Lubecore: trade-dress infringement, unfair competition, and false advertising, all in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a) (Counts 1-3); deceptive trade practices, in violation of Ohio Revised Code §§ 4165.02 *et seq.* (Count 4); unfair competition, in violation of Ohio common law (Count 5); and unlawful interference with contractual and business relationships, again in violation of Ohio common law (Count 6). Groeneveld sought monetary damages and

permanent injunctive relief.  It also filed a motion for a preliminary injunction on the same day as the complaint.

The parties consented to the adjudication of Groeneveld's preliminary-injunction motion by a magistrate judge, who denied the motion after a four-day hearing. Groeneveld and Lubecore then filed cross-motions for summary judgment before the district court.  In a three-page summary order, the court denied both motions and set the case for trial.

A seven-day jury trial was held in October 2011.  At the close of Groeneveld's proof, Lubecore moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, which motion it renewed at the close of all the evidence.  The district court, ruling from the bench and without any analysis (other than "I've listened to everything, believe me"), granted Lubecore's Rule 50 motion with respect to Counts 2-6 of the complaint, but reserved ruling on Count 1, the trade-dress claim.

Count 1 was subsequently submitted to the jury in the form of the following three interrogatories, which track the three elements of a trade-dress claim:

> 1.   Do you find that Plaintiff Groeneveld proved by a preponderance of the evidence that its Trade Dress (the external shape and appearance of the pump, including logo and color) are non-functional?
>
> 2.   Do you find that Plaintiff Groeneveld proved by a preponderance of the evidence that its Trade Dress (the external shape and appearance of the pump, including logo and color) is distinctive in the marketplace, that is has it acquired secondary meaning?
>
> 3.   Do you find that Plaintiff Groeneveld proved by a preponderance of the evidence that there is a likelihood of confusion in the minds of consumers of EP[0] pumps as to the source of Defendant Lubecore's EP[0] pump?

The jury answered "yes" to all three interrogatories and awarded Groeneveld damages in the amount of $1,225,000.  On the following day, the jury returned to hear arguments as to whether Lubecore's trade-dress infringement had been willful (which

would be a relevant consideration for the purpose of damages in the event that Groeneveld's other claims were revived on appeal). It answered "yes" to this question also. The district court accepted the jury's answers and entered judgment in favor of Groeneveld. It also entered a permanent injunction barring Lubecore from selling its grease pump in the United States.

After the jury rendered its verdict, Lubecore renewed its pending Rule 50 motion for judgment as a matter of law and moved in the alternative for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. The district court denied both motions. Lubecore's timely appeal and Groeneveld's cross-appeal followed.

Regarding the denial of its Rule 50 and Rule 59 motions, Lubecore contends that there was insufficient evidence on all three elements of Groeneveld's trade-dress claim—nonfunctionality, secondary meaning, and the likelihood of confusion—to submit the claim to the jury. Alternatively, Lubecore argues that the jury's findings on all three elements were against the weight of the evidence. It also seeks to set aside the damage award on the ground that there was no finding of a causal link between Lubecore's alleged trade-dress infringement and Groeneveld's lost profits. Groeneveld's cross-appeal, in turn, seeks a judgment and punitive damages on the previously dismissed counts of its complaint (Counts 2-6), as well as a broadening of the district court's injunction to include Canada.

## II. ANALYSIS OF LUBECORE'S APPEAL

### A. Standard of review

Rule 50 of the Federal Rules of Civil Procedure authorizes a court to grant judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). A motion for judgment as a matter of law should be granted "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The standard for judgment as a matter of law under Rule 50

is the same as the standard for summary judgment under Rule 56. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). We review the district court's denial of a Rule 50 motion de novo. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008).

## B.  Legal framework

The Lanham Act, 15 U.S.C. §§ 1051-1141n, encompasses the protection not just of wordmarks and symbols, but also of trade dress. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000). "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (brackets, ellipsis, and internal quotation marks omitted). It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.* (internal quotation marks omitted). Trade dress might include, for example, the outer shape and design of a Ferrari car (*Ferrari S.P.A. v. Roberts*, 944 F.2d 1235 (6th Cir. 1991)), or of a Gibson guitar (*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539 (6th Cir. 2005)); the arrangement, content, and layout of an Abercrombie & Fitch catalogue (*Abercrombie*, 280 F.3d 619); or the decoration, vibe, and "motif" of a Mexican restaurant (*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)).

Trade dress is generally classified into the categories of either "product design" (also known as "product configuration") or "product packaging," and occasionally a "*tertium quid*," a third, indeterminate catchall. *Samara Bros.*, 529 U.S. at 215. The trade dress at issue in the present case—the overall design of Groeneveld's grease pump—indisputably falls under the product-design category.

To prevail on a claim for the infringement of a product-design trade dress, a plaintiff must prove that its allegedly infringed product design (1) is nonfunctional, (2) has acquired secondary meaning, and (3) is confusingly similar to the allegedly

infringing product design. *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006); *accord Samara Bros.*, 529 U.S. at 211. The meaning of these three elements is fleshed out in the caselaw.

A product design is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982). The Supreme Court, for example, has held that the "dual-spring design" employed at the base of road signs to make them withstand strong wind gusts is functional and therefore cannot be protected as trade dress. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).

Secondary meaning, perhaps more helpfully dubbed "acquired meaning," indicates that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs.*, 456 U.S. at 851 n.11; *Samara Bros.*, 529 U.S. at 211, 211 n.*. For example, this court has held that the outer-body design of a Ferrari car possesses secondary meaning because Ferrari showed that the public primarily associates that design with a Ferrari car, not just generically with a sports car. *See Ferrari*, 944 F.2d at 1239-42.

Finally, the test for confusing similarity, also called the "likelihood of confusion" test, is whether an ordinary consumer would confuse the products at issue, which in fact come from different sources, as emanating from a single source or from associated sources. *See, e.g.*, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). The "general concept underlying the likelihood of confusion is that the public believe that the mark or dress owner sponsored or otherwise approved the use of the trademark or trade dress." *Abercrombie*, 280 F.3d at 645 (brackets and internal quotation marks omitted). Whereas nonfunctionality and secondary meaning are required to show protectability—that is, that the plaintiff's trade dress is capable of Lanham Act protection in the first place—likelihood of confusion is required to show that the trade dress has in fact been infringed by the defendant. *Abercrombie*, 280 F.3d at 629.

All three of the foregoing requirements—nonfunctionality, secondary meaning, and the likelihood of confusion—are *elements* of a trade-dress infringement claim, not *defenses* to such a claim. *See, e.g.*, *Lanard Toys*, 468 F.3d at 414. The burden of proving each requirement therefore falls on the plaintiff. *Id.* at 414, 416-17; 15 U.S.C. § 1125(a)(3). If the plaintiff fails to present sufficient evidence for a reasonable jury to find in its favor on any one of the three elements, then judgment as a matter of law should be entered for the defendant. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

The parties in the present case dispute whether Groeneveld made a sufficient showing to enable a reasonable jury to find in its favor on each of the three elements. Their focus, however, is on nonfunctionality and the likelihood of confusion. We will therefore concentrate on these two elements.

## C. Nonfunctionality

Groeneveld does not dispute that its grease pump is a functional device designed to automatically lubricate commercial trucks. Nor does Groeneveld attempt to protect the individual component parts of its pump. Rather, the question is whether the "overall shape" of the grease pump (such shape being the trade dress claimed by Groeneveld) "is essential to the use or purpose of the article or . . . affects the cost or quality of the article." *See Inwood Labs.*, 456 U.S. at 850 n.10.

Groeneveld's pump, in its overall shape, consists of a black base topped by a clear reservoir. The base is made of cast aluminum and contains the pump mechanism, which is connected by wires and hoses to the rest of the ALS; the reservoir is made of plastic and holds the grease. Both components clearly serve a function essential to the product's operation.

Trial testimony by two Groeneveld witnesses, Willem van der Hulst and Cornelius Wapenaar, makes clear that not only the basic manufacture of the grease

pump's components, but also their size and shape, are closely linked to the grease-pumping function. The shape of the base is functionally determined because it minimizes the amount of material needed in construction. And the volume of the reservoir is functionally dictated by the amount of grease that the vehicle needs during each servicing interval. The use of clear material in the reservoir is also functional because it allows one to easily see how much grease is left in the pump.

Because the volume of the reservoir (like that of any cylinder) is the algebraic product of its surface area times its height, and because the surface area and the volume of the reservoir are both functionally determined (the former by the necessity of fitting into the base and the latter by the necessity of holding a predetermined amount of grease), the height is also functionally determined. The overall design of the grease pump is therefore functional. As the magistrate judge found when denying Groeneveld's motion for a preliminary injunction, "all the elements of Groeneveld's pump are there for some practical benefit or reason . . . . Groeneveld has not presented its pump as in any way the equivalent of an automotive tail fin—a purely ornamental feature that contributes no demonstrable benefit to the operation or efficiency of the designed product."

Because Groeneveld presented no evidence showing that the individual components of its grease pump or their overall configuration are nonfunctional, it failed to carry its burden of creating a triable issue of fact with respect to nonfunctionality. *See Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003) ("[I]n order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way. . . . In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional." (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001)); *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) (reversing the jury's finding of trade-dress infringement, granting judgment as a matter of law for the defendant, and holding that "where the whole is

nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional").

Groeneveld nonetheless argues that the design of its pump is nonfunctional because the particular design is not necessary for effective competition in the ALS business. This is shown, according to Groeneveld's opening brief, by the fact that none of Groeneveld's competitors other than Lubecore makes a similar-looking pump:

> Several products compete with Groeneveld's EP0, but none comes anywhere close to Groeneveld's trade dress, other than the Lubecore, that looks like an exact copy of it[.] All these products have the same purpose—to pump grease—yet no other competitor found it necessary to copy Groeneveld's trade dress.

We reject Groeneveld's argument because adopting it would result in a reversion to the very standard that the Supreme Court unanimously rejected in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). That case concerned the trade dress of a "dual-spring design" employed in the base of outdoor signs in order to keep them upright in strong wind conditions. *Id.* at 25. Our circuit reversed the district court's determination that the dual-spring design was functional, reasoning that "[i]t takes little imagination" to conceive of alternative workable designs. *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 940 (6th Cir. 1999). This court instead held that "[t]he appropriate question is whether the particular product configuration is a competitive necessity." *Id.*

But competitive necessity is an appropriate avenue of inquiry, the Supreme Court held, only in cases of "esthetic functionality," not in cases of utilitarian functionality where a design is essential to the use or purpose of a device. *TrafFix Devices*, 532 U.S. at 33. The Supreme Court then reversed this court's decision regarding the dual-spring design, holding that the proper measure of functionality is the previously quoted "essential to the use or purpose" standard, not the competitive-necessity test:

> Discussing trademarks, we have said[,] in general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. Expanding upon the meaning of this phrase, we have observed that a functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage. The Court of Appeals in the instant case seemed to interpret this language to mean that a necessary test for functionality is "whether the particular product configuration is a competitive necessity." 200 F.3d at 940. This was incorrect as a comprehensive definition. As explained in [*Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159 (1995), and *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)], a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device . . . . Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature.

*TrafFix Devices*, 532 U.S. at 32-33 (some internal citations and some quotation marks omitted). Because the dual-spring design in *TrafFix Devices* accomplished the function of keeping the signs upright in strong winds, the Supreme Court held that our circuit had erred in requiring competitors to explore alternative designs (such as using three or four springs) and in finding the design to be nonfunctional. *Id.* at 33-34.

*TrafFix Devices* makes clear that Groeneveld's argument about the availability of alternative grease-pump designs is misguided. The issue is not whether Lubecore could have designed a grease pump with a different appearance; the issue is whether Groeneveld's design "is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs.*, 456 U.S. at 850 n.10. In other words, the question is whether the overall shape of Groeneveld's grease pump was substantially influenced by functional imperatives or preferences. *See Antioch*, 347 F.3d at 158 (framing the inquiry as whether "engineering necessity influenced the configuration of the functional components"). We accordingly reject Groeneveld's invitation to drift back into the error of inquiring about possible alternative designs. *See id.* at 157 (holding that, in light of *TrafFix Devices*, the district court properly rejected evidence concerning the availability of alternative scrapbook-album designs where the plaintiff's

"dual strap hinge" design was functional because it held the album together and permitted the pages to lie flat).

Groeneveld next points to the testimony of Willem van der Hulst, its Vice President of Design and Production, who was involved in designing the EP0 grease pump. Van der Hulst testified that Groeneveld did not "have to make its pump look this way on the inside because of the way it works on the outside." For the reasons stated above, this testimony is insufficient to create a triable issue of fact under *TrafFix Devices* because it improperly focuses on the possibility of alternative designs.

Moreover, van der Hulst's testimony was entirely conclusory—he simply asserted that Groeneveld was not limited to any particular design, but he did not explain *why* the chosen design was nonfunctional, and certainly did not speak with any particularity about the functional considerations that, as outlined above, apparently dictated the pump's design. The same goes for van der Hulst's bald assertion that the pump's design did not "affect the way the thing performs." *See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co., Ltd.*, 668 F.3d 677, 684 (9th Cir. 2012) (holding that the plaintiff's evidence of nonfunctionality was insufficient as a matter of law where, "[e]xcept for conclusory, self-serving statements, [the plaintiff] provide[d] no other evidence of fanciful design or arbitrariness").

Groeneveld next asserts that *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. 2006), held that a company manager's testimony about product development "was legally sufficient evidence of non-functionality." But *Lanard Toys* does not stand for the proposition that the bare act of putting a manager on the stand to claim nonfunctionality is sufficient to create a triable issue of fact. If that were the law, any plaintiff could get a jury trial on the issue in question by simply mouthing the legal conclusion that its product design is nonfunctional. The holding in *Lanard Toys* was instead predicated on the court's specific conclusion that the design features in question were not influenced by functional considerations. *See id.* at 417 (crediting the testimony of a General Motors manager to the effect that the Army's performance specifications dictated certain elements of the Humvee's dimensions, but not the vehicle's "exterior

appearance and styling," including its "grille, slanted and raised hood, split windshield, rectangular doors, [and] squared edges," elective features that did not perform any function).

Groeneveld further relies on van der Hulst's testimony to the effect that Groeneveld's "commercial people" "have a finger in the pot" and "have the most power in the group." The record is unclear as to what this testimony means and why it is relevant to the issue of nonfunctionality. There are multiple references in van der Hulst's testimony to the so-called "commercial people," but Groeneveld never explained the meaning of the phrase. If, as the literal meaning of the word "commercial" suggests, the "commercial people" were business executives in charge of evaluating the pump's commercial viability, then the involvement of such individuals in developing the product design says nothing about whether or not the design is nonfunctional. The same is true if "commercial people" means managers generally. And even if "commercial people" means those in the marketing or design department, the testimony would still be unhelpful to Groeneveld. Every viable mass-market product is presumably designed with marketing considerations in mind, and this unremarkable fact says nothing about whether the product design is nonfunctional.

Finally, Groeneveld points to van der Hulst's testimony that the other grease pumps on the market look "terrible," and that Groeneveld's founder was "different from the really old-fashioned mechanical people" in that "he had very good choice" and "like[d] nice things," such as "a nice office, nice cars, nice people." Van der Hulst also testified that Groeneveld has not switched to alternative grease-pump designs, even though they might be cheaper, because the current pump is "a very nice pump" and "[e]verybody knows this pump."

But these statements fail to meaningfully address the issue of nonfunctionality. The fact that Mr. Groeneveld has good taste does nothing to prove that the grease pump's design is nonfunctional. And to the extent that van der Hulst's testimony was intended to show that less attractive or cheaper grease-pump designs were also possible, such a showing plainly falls short under *TrafFix Devices* because courts should not

inquire into alternative designs when the design at issue is substantially influenced by functional considerations. *See TrafFix Devices*, 532 U.S. at 33-34 ("There is no need . . . to engage, as did the Court of Appeals, in speculation about other design possibilities . . . . Here, the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used. The dual-spring design is not an arbitrary flourish in the configuration of MDI's product; it is the reason the device works. Other designs need not be attempted." (internal citation omitted)).

In short, Groeneveld's evidence was insufficient to enable a reasonable jury to find that the grease pump's design is nonfunctional. And Groeneveld's proof of nonfunctionality is rendered even more wanting by the fact that Lubecore has pointed to the testimony of van der Hulst and Wapenaar, Groeneveld's own witnesses, to show that the pump's volume, shape, and materials are all essentially influenced by the dictates of function.

This result is consonant with the public policy underlying the functionality doctrine, which is to channel the legal protection of useful designs from the realm of trademark to that of patent. Such channeling ensures that the high public costs of monopoly are not imposed without an assurance that the design satisfies the rigorous requirements of patentability, including novelty and nonobviousness, and is protected for only a limited period of time. As well stated by the Supreme Court,

> [t]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

*Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 164-65 (1995) (internal citations omitted); *accord Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 159-60 (6th Cir. 2003).

Groeneveld has no patent on the design of its grease pump. That is why it has pursued a trade-dress claim under the Lanham Act. But nonfunctionality is an indispensable element of a trade-dress claim, so Groeneveld's failure to raise a triable issue as to whether its product design is nonfunctional is alone sufficient to require judgment as a matter of law in favor of Lubecore on this claim. We will nevertheless proceed to discuss the likelihood-of-confusion element of a trade-dress claim because it bears upon Groeneveld's cross-appeal and further supports our resolution of this case in light of the important public-policy issues involved.

**D. The likelihood of confusion**

Another element that Groeneveld must prove in order to prevail on its trade-dress claim is that an ordinary consumer of grease pumps would likely be confused into thinking that the two pumps at issue were manufactured by the same company or were associated or affiliated with the same company. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 645 (6th Cir. 2002); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). The appropriate benchmark for assessing the likelihood of confusion is the ordinary consumer who would consider buying the product at issue. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1266 (6th Cir. 1985) ("In assessing the similarity of two marks, it is the effect upon prospective purchasers that is important." (brackets and internal quotation marks omitted)). And the focus is on "the typical buyer exercising ordinary caution," *Daddy's Junky Music*, 109 F.3d at 285, not "the most obtuse consumer," *Abercrombie*, 280 F.3d at 648 (internal quotation marks omitted).

This court has enumerated eight factors to consider in determining whether the trade dresses of competing products present a sufficient likelihood of confusion: "(1) strength of the plaintiff's [trade dress]; (2) relatedness of the goods; (3) similarity of the [trade dresses]; (4) evidence of actual confusion; (5) marketing channels used;

(6) likely degree of purchaser care; (7) defendant's intent in selecting the [trade dress]; (8) likelihood of expansion of the product lines." *Frisch's*, 759 F.2d at 1264. To create a triable issue of fact, the plaintiff's "burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Abercrombie*, 280 F.3d at 646 (internal quotation marks omitted).

These factors are helpful guides rather than rigid requirements, *Daddy's Junky Music*, 109 F.3d at 280, with "[t]he ultimate question remain[ing] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* The *Frisch* factors are therefore not always weighed consistently in this court's caselaw, and a particular factor might receive a greater or lesser weight depending on the circumstances. Accordingly, this court has sometimes resolved the question of confusion by reference to only one or a few of these factors, without inquiring into the rest. *See Abercrombie*, 280 F.3d at 646-47 (considering "only one of the eight factors," namely, the similarity of the parties' trade dresses in light of their different logos and brands, and ruling for the defendant on that basis).

In the present case, Groeneveld's and Lubecore's logos and trademarks appearing on their respective product designs are unmistakably different, as shown in the product photos at the beginning of this opinion. The former is green with a large "G" mark and says "GROENEVELD"; the latter is red with a maple-leaf mark and says "lubecore." And the evidence is undisputed that the same logos appear on the parties' sales and marketing literature. In light of such a stark visual difference in branding, no reasonable consumer would think that the two grease pumps belong to the same company. *See Abercrombie*, 280 F.3d at 647 (holding that, because the trademarks of Abercrombie & Fitch and American Eagle were displayed throughout their clothing catalogs, the catalogs' trade dresses were, "as a matter of law, not similar"); *Frisch's*, 759 F.2d at 1265 (holding that Shoney's use of the phrase "Big Boy" in the name of its restaurants did not render the phrase confusingly similar to Frisch's own Big Boy restaurants, in part because "[b]y emphasizing '*Shoney's* Big Boy Restaurants,' as it did in its advertising, Shoney's has identified *itself* as the source of the services") (emphases in original);

*Antioch*, 347 F.3d at 160 ("Westrim's use of its own distinctive logo, scrollwork, stickers, and face sheet provide sufficient signals to scrapbook buyers that its albums are not made by Antioch, and Antioch has not contended otherwise."); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004) (holding that the parties' use of their respective "house marks" in proximity to the challenged mark "reduces the likelihood of confusion from any similarity that does exist"); *see also Daddy's Junky Music*, 109 F.3d at 283 ("Similarity of marks is a factor of considerable weight.").

This conclusion is reinforced by the fact that, at about \$2,500 apiece, ALS systems are expensive industrial products that are not likely to be purchased without substantial care and research. *Compare Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 n.13 (6th Cir. 2005), *and Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 423 (6th Cir. 2012) (noting, respectively, that purchasers of \$3,000 guitars and \$100 bottles of tequila likely exercise a high degree of care), *with Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 413 (6th Cir. 2006), *and Frisch's*, 759 F.2d at 1269 (noting, respectively, that purchasers of inexpensive toys and fast food are not likely to exercise a high degree of care).

Groeneveld does not dispute that potential purchasers of grease pumps are knowledgeable and sophisticated people. Such purchasers are therefore not likely to ignore the stark difference in labeling and mistakenly purchase a Lubecore ALS when they intend to purchase a Groeneveld ALS. As this court has stated,

> when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard [of consumer confusion] is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Daddy's Junky Music*, 109 F.3d at 285; *accord Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 213 (3d Cir. 1995) ("In the case of a relatively high-priced, single-purchase article, there is hardly likelihood of confusion or palming off when the

name of the manufacturer is clearly displayed." (internal quotation marks and ellipsis omitted)).

Groeneveld argues, however, that the two pumps' starkly different labeling would not distinguish the pumps in the eyes of their sophisticated consumers because "(1) labels are not the predominant brand identifiers in the industry; (2) corporate mergers and acquisitions are frequent, so competitor affiliations are constantly changing; (3) many pumps bear multiple company names; (4) a pump's label does not identify who made it or where it was manufactured; (5) Lubecore is a newcomer and has no independent brand recognition; and (6) witnesses who saw the Lubecores were still confused, notwithstanding the Lubecore label." We find none of these arguments persuasive.

Points (2) and (5) simply have no bearing on the issue of whether the pumps' different labels are sufficient to tell them apart. Point (1) is similarly irrelevant and, in any event, is not supported by the record evidence cited by Groeneveld. The most that the cited testimony shows is that certain witnesses were able to distinguish Groeneveld's pumps from pumps other than Lubecore's without even looking at the labels, which says nothing about whether a consumer would be able to distinguish a Groeneveld pump from a Lubecore pump with the labels. Points (3) and (4), on the other hand, plainly do not apply to the labels at issue in the present case. Finally, point (6), which is really Groeneveld's only relevant argument on this issue, will be discussed below under the "actual confusion" factor. The upshot is that Groeneveld has at most identified possible reasons why—hypothetically—differential branding might not be sufficient to distinguish the sources of competing products, but it did not present any evidence to show that any of those hypothetical reasons actually applies in the present case.

We therefore conclude that the starkly different branding of the two grease pumps and the high degree of care presumably exercised by the pumps' sophisticated consumers—factors 3 and 6 of the *Frisch* factors—compel the conclusion that, as a matter of law, Groeneveld has failed to carry its burden of raising a triable issue regarding the likelihood of confusion. Nevertheless, in order to give Groeneveld the

benefit of all favorable inferences, we will proceed to analyze all of the *Frisch* factors to see whether, taken together, they would enable a reasonable jury to find for Groeneveld on this issue.

### 1. *Lubecore's intent in selecting the trade dress*

Because Groeneveld makes Lubecore's intent the centerpiece of its likelihood-of-confusion analysis, we will start with this factor and then proceed to the other *Frisch* factors. Groeneveld argues that Lubecore intended to copy Groeneveld's trade dress (minus the label) and that this "bad intent," for which Lubecore has offered "no innocent explanation whatsoever," is sufficient to prove the likelihood of confusion.

The similarities in the two pumps' appearance (excluding the labels), the fact that other manufacturers' pumps do not have a similar look, and the fact that Lubecore's founder used to be a Groeneveld employee constitute circumstantial evidence of an intent to copy. But Groeneveld is mistaken about the legal significance of such copying. In particular, its assertion that the intentional copying of its trade dress constitutes "bad intent" that creates a "presumption of confusing similarity" indicates a fundamental misapprehension of the purposes of trademark law.

Groeneveld's argument fails to appreciate that trademark law does not prohibit *copying* as such; that is the province of copyrights and patents. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001) ("The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity."); *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 686 (6th Cir. 2006) ("Trademark law cannot properly make an end run around the strict requirements of utility patent law by giving equivalent rights to exclude." (brackets and internal quotation marks omitted)).

A manufacturer who desires protection against copying must satisfy the requirements of protectability under the copyright or patent regimes and must also submit itself to the limited time periods of protection afforded under those regimes. Those requirements and their attendant restrictions incentivize valuable artistic and

scientific creations while ensuring that the social costs of monopoly are contained within reasonable bounds.  *See* U.S. Const. art. I, § 8, cl. 8 (the Copyright and Patent Clause) ("The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146-51 (1989) (explicating the policies and tradeoffs of the patent system); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 428-29 (1984) (explicating the policies and tradeoffs of copyright law).

The public policy behind the patent regime is perhaps most clearly set out in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964):

> The grant of a patent is the grant of a statutory monopoly . . . . Patents . . . are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention. . . . But in rewarding useful invention, the rights and welfare of the community must be fairly dealt with and effectually guarded.  To that end the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced. . . . Thus the patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition.

*Id.* at 229-31 (internal citations and quotation marks omitted).

Trademark law's likelihood-of-confusion requirement, in contrast, is designed to promote informational integrity in the marketplace.  By ensuring that consumers are not confused about what they are buying, trademark law allows them to allocate their capital efficiently to the brands that they find most deserving.  This, in turn, incentivizes manufacturers to create robust brand recognition by consistently offering good products and good services, which results in more consumer satisfaction.  That is the virtuous cycle envisioned by trademark law, including its trade-dress branch.  As stated in *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159 (1995):

> In principle, trademark law, by preventing others from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product. The law thereby encourages the production of quality products, and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale. It is the source-distinguishing ability of a mark . . . that permits it to serve these basic purposes.

*Id.* at 163-64 (internal citations, quotation marks, and brackets omitted) (emphasis in original).

Such an incentive structure would of course be disrupted if a manufacturer's hard-won brand recognition were open to appropriation by other manufacturers who confused consumers into believing that the two brands are affiliated or are one and the same. If manufacturers' qualitative efforts were subject to such skimming off, they would have less incentive to improve their offerings and build a robust brand in the first place.

No harm is done to this incentive structure, however, by the copying of a product design that does *not* confuse consumers as to the product's source. As long as a consumer can easily identify the source based on the trademark, the consumer will still be able to allocate his or her capital freely and efficiently, and manufacturers will retain the incentive to improve their offerings and solidify their brands. So trademark law, like the law of unfair competition of which it is a part, focuses not on copying per se but on confusion:

> The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source. While that concern may result in the creation of 'quasi-property rights' in communicative symbols,

the focus is on the protection of consumers, not the protection of producers as an incentive to product innovation. Judge Hand captured the distinction well in *Crescent Tool Co. v. Kilborn & Bishop Co.*, 247 F. 299, 301 (2d Cir. 1917), where he wrote: "The plaintiff has the right not to lose his customers through false representations that those are his wares which in fact are not, but he may not monopolize any design or pattern, however trifling. The defendant, on the other hand, may copy plaintiff's goods slavishly down to the minutest detail:  but he may not represent himself as the plaintiff in their sale."

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) (brackets and emphasis omitted).

That is why, in the absence of consumer confusion, and in the absence of any copyright or patent protection, copying is perfectly legal.  Indeed, such copying is more than just legal; it is often beneficial:

Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy.  Allowing competitors to copy will have salutary effects in many instances.  Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (internal citations and quotation marks omitted); *accord Bonito Boats*, 489 U.S. at 156-57 ("[T]he efficient operation of the federal patent system depends upon substantially free trade in publicly known, unpatented design and utilitarian conceptions.  . . .  Both the novelty and the nonobviousness requirements of federal patent law are grounded in the notion that concepts within the public grasp, or those so obvious that they readily could be, are the tools of creation available to all.  They provide the baseline of free competition upon which the patent system's incentive to creative effort depends."); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 238 (1964) ("[I]f the design is not entitled to a

design patent or other federal statutory protection, then it can be copied at will."); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964).

The same principle has been affirmed repeatedly by this court. *See Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 160 (6th Cir. 2003) ("Antioch repeatedly attacks Westrim for slavishly copying the CREATIVE MEMORIES album. What Antioch fails to appreciate is that copying is not always discouraged or disfavored and can have salutary effects. Copying preserves competition, which keeps downward pressure on prices and encourages innovation." (brackets, citations, and quotation marks omitted)); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 640 (6th Cir. 2002) (explaining that "copying preserves competition"); *See also* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:19 ("[C]opying in order to imitate an unpatented functional aspect of a competitor's product is what free competition is all about . . . .").

The clear import of the twin principles that copying in the absence of copyright or patent protection often serves useful purposes, and that the concern of trademark law is not about copying per se but about copying that engenders consumer confusion, is that the appropriate "intent" to focus on is not the intent to *copy* but rather the intent to *deceive* or *confuse*. *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (discussing the "inten[t] to infringe"); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997) (referring to the "intent of causing confusion"); *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1243 (6th Cir. 1991) (asking whether the intent was "to deceive purchasers and thus derive a benefit from another's name and reputation" or "rather to avail oneself of a design which is attractive and desirable"); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1269-70 (6th Cir. 1985) (referring to "fraudulent intent" in the context of whether the defendant "acted to perpetuate any false impressions that consumers might have").

If the law were otherwise, an act that is not only legal but also often beneficial would be transformed into evidence—or worse, as Groeneveld suggests, a

"presumption"—of unlawfulness. Such an interpretation would contravene *TrafFix Devices* and the other decisions cited above and would subvert the fundamental purposes of trademark law. We recognize that the intent to copy might be probative in proving secondary meaning, *see, e.g.*, *Abercrombie*, 280 F.3d at 639, but such intent standing alone has no bearing on the likelihood-of-confusion issue.

The principle that copying can have salutary effects is illustrated by the circumstances of the present case. Contrary to Groeneveld's protestation that Lubecore's copying of Groeneveld's design (minus the logo) has "no innocent explanation," the similarity serves the procompetitive purpose of signaling the existence of a competitive alternative by alerting potential consumers that the pumps might work the same because they look the same.

By making the appearance of its pump essentially the same as Groeneveld's (other than the label), Lubecore has specifically targeted consumers who are familiar with the Groeneveld pump and offered them a competitive option. The Supreme Court has unanimously confirmed that using a functional product's look to promote a competitive offering is a procompetitive practice. *See TrafFix Devices*, 532 U.S. at 34 ("If buyers are assured the product serves its purpose by seeing the operative mechanism[,] that in itself serves an important market need.").

Lubecore's targeting of Groeneveld's customers would of course be unfair and anticompetitive if Lubecore masqueraded as Groeneveld and confused them about the product they were buying. But Lubecore has in fact scrupulously avoided such confusion by choosing a starkly different logo that it prominently displays on its pumps and on all its sales and marketing literature. That is why the differential labeling is critical—it transforms a practice that would otherwise be anticompetitive into one that is procompetitive. And by specifically targeting Groeneveld customers, Lubecore focuses its competitive activity on those who are most interested in such competition, thereby decreasing the consumers' search costs and intensifying competition where it matters most. None of this is to say, of course, that consumers should switch from Groeneveld to Lubecore or that Lubecore makes a better pump. The point, rather, is that

the state of affairs where consumers are aggressively courted and offered competitive options is beneficial as a matter of public policy.

These points are borne out by one of Groeneveld's witnesses, Dean Osborn, who testified that he likes the way the Groeneveld pump works but does not particularly care who manufactures it. Therefore, when Lubecore offered him *its* pump as an alternative to the Groeneveld pump, he considered and ultimately bought the Lubecore pump. Osborn testified that he has been satisfied with both the Groeneveld and the Lubecore pumps that he has owned, and that he has never been confused between the two brands:

> [Osborn:] [W]hat I would think is if you just, if you took off the top half of the thing and you took all the labels off of these things, take the red thing off and the black one and you take the label off here and you put that base with this off and that off and you look at the bases, to me I would not tell the difference. And to me that means I'm comfortable with the product. If it be whose product it is, I don't care. I have a good experience with it. So I'm very comfortable with it. Whatever labels you put on it or sticker, you know, I mean it doesn't matter. I'm looking at the mechanism that functions the grease to go to the spots where the greasing, that's all I'm -- that's all I care about.
>
> . . .
>
> [Groeneveld's Counsel:]  Sir, would you have considered or bought the Lubecores if the pump didn't look so much like the Groeneveld pump?
>
> [Osborn:]  It made me very comfortable when it -- when that looks like a Groeneveld . . . . The Lubecore, the comfort zone of knowing that it looks identical to it and it probably operates the same thing, they, you know, in the literature they have the blocks of where the main grease goes to the different blocks and then it goes out. Everything to me resembles the same, you know what I mean. The Lubecore and Groeneveld, they look like sister machines, okay. They look like twins. And for me making my decision on buying a greaser, that's easy. I like these two systems. Who owns it doesn't matter to me. I just want the grease to go to the places to where [it should go] and I want a place here to service it.
>
> . . .

[Lubecore's Counsel:] . . . When you bought the four Lubecore systems, it was clear to you that you were buying Lubecore systems, not Groeneveld systems, correct?

[Osborn:] Correct.

[Lubecore's Counsel:] Garvin [an independent distributor through which both parties sold their ALS systems] has told you as much himself?

[Osborn:] Um-hum, yes.

[Lubecore's Counsel:] And the product has got Lubecore's label on it more than one place, right?

[Osborn:] Yes.

[Lubecore's Counsel:] And you said you were given some Lubecore marketing materials?

[Osborn:] Yes.

[Lubecore's Counsel:] So there was no confusion on your part about whose product you were buying?

[Groeneveld's Counsel:] Objection.

[Osborn:] Correct.

Groeneveld objects to Lubecore's targeted competition, arguing that Lubecore's pumps are of "diminish[ed] . . . quality," have been subject to recalls, and "have been seen leaking grease." It also points to Lubecore's practice of offering to extend Groeneveld's warranty and to replace Groeneveld pumps and parts with Lubecore products.

These allegations, however, do not strengthen Groeneveld's trade-dress claim or make Lubecore's competition unfair. If Lubecore's pumps are in fact inferior, all the better for Groeneveld: Consumers would soon realize the difference in quality on the clearly labeled pumps and flock to Groeneveld. But that is a business judgment to be made by consumers as they see fit, not a legal judgment to be dictated by trade-dress law. The free market, not the courts, should pick winners and losers in the business world. As stated in *TrafFix Devices*, 532 U.S. at 28, "protection for trade dress exists to promote competition," not to hinder it.

Groeneveld's protestations against slavish copying admittedly have a certain emotional appeal and presumably swayed the jury. After all, people generally dislike copycats. But, as the foregoing discussion demonstrates, the proper application of trademark law requires us to focus our analysis not on the intent to copy the product design, but on the likelihood of consumer confusion. Evidence of Lubecore's intent to copy Groeneveld's product design is therefore of no help to Groeneveld. Such evidence, if anything, shows the procompetitive benefits of Lubecore's practices and cautions against allowing the issue to go to the jury. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 214 (2000) (discussing the desirability of "summary disposition of an anticompetitive strike suit" in the trade-dress context).

### 2. Strength of Groeneveld's trade dress

This factor "focuses on the distinctiveness of a mark and its recognition among the public." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (internal quotation marks omitted). Groeneveld submitted evidence of its prominence and pedigree in the industry, its extensive advertising, and, most importantly, witnesses who testified that they recognized the pump's design and associated it with Groeneveld. This evidence is sufficient to support a factual finding that Groeneveld's trade dress is strong. But such a finding is of no help to Groeneveld in the absence of any evidence that consumers are likely to confuse the source of the competing grease pumps.

### 3. Relatedness of the goods

The parties do not dispute that Groeneveld's and Lubecore's grease pumps perform the same function and directly compete in the industry. So this factor would also favor Groeneveld if it had any proof of the likelihood of confusion.

### 4. Similarity of the marks

As discussed above, the starkly different labels and trademarks on the competing products serve to dispel any likelihood of confusion between the two pumps. This factor weighs heavily against Groeneveld.

### 5. *Evidence of actual confusion*

Nothing shows the likelihood of confusion more than the fact of actual confusion.  So evidence of actual consumer confusion, though not necessary, would be immensely helpful to Groeneveld.  *See Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1267 (6th Cir. 1985) (noting that evidence of actual confusion "is not necessary," but "it is obviously the most probative proof of likelihood of confusion"); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) (same).

But Groeneveld submitted no surveys showing whether a sample of the relevant consumer population was actually confused as between the parties' products.  See *Frisch's*, 759 F.2d at 1267-69, and *General Motors Corp. v. Lanard Toys, Inc.*, 468  F.3d  405, 414 (6th Cir. 2006), which discuss the significance of consumer surveys in showing the likelihood of confusion.  Groeneveld instead offered the testimony a single customer, Dean Osborn, in support of its actual-confusion claim.  Osborn, however, unequivocally testified on cross-examination that he was *not* confused as to the origin of the pumps, as reflected in the transcript quoted above.

Groeneveld also cites the testimony of some of its own employees and affiliates professing "shock" and "surprise" that Lubecore's pump "looks the same" as Groeneveld's, saying that it "looks like a Groeneveld with a Lubecore sticker on it."  None of these witnesses, however, were consumers, and none of them were actually confused as to the origin of the two pumps.  Indeed, Groeneveld admitted at oral argument that it had no evidence of actual confusion:

> [Judge Gilman:]  Do you have any evidence that anybody thought they were buying your client's product when they were actually buying Lubecore's?
>
> [Groeneveld's Counsel:]  I don't.

In sum, there is simply no evidence of actual confusion in the record.

### 6. *Marketing channels used*

The record contains evidence that both parties often attended the same industry trade shows, that they marketed their products over the Internet, and that certain distributors sold both parties' ALS systems. Such evidence is sufficient to show that there is a commonality in how the ALS systems are marketed. But, again, this evidence would be helpful to Groeneveld only if there were any showing of the likelihood of confusion.

### 7. *Likely degree of purchaser care*

As previously discussed, consumers of grease pumps are knowledgeable and sophisticated about the market, and they are unlikely to buy an expensive ALS system without exercising a substantial degree of care. This factor strongly favors Lubecore, especially when coupled with the stark dissimilarity in labeling.

### 8. *Likelihood of market expansion*

The only evidence regarding the likelihood of market expansion with respect to either company was the testimony of Eisses, Lubecore's founder, that he "really would like to move into the United States," but could not do so because of the lawsuit. This factor, however, does not alter our analysis in the absence of any evidence of confusing similarity.

### 9. *Summary of the* **Frisch** *factors*

The upshot of the likelihood-of-confusion analysis is that (1) the overall trade dresses of the two pumps are dissimilar because they are distinguished by starkly different logos, (2) the sophisticated purchasers of the expensive ALS systems presumably exercise a high degree of care in making their purchases, (3) there is no evidence of actual confusion, and (4) the intent and effect of Lubecore's choice of design is procompetitive. These *Frisch* factors all weigh in Lubecore's favor. By contrast, the factors that weigh in Groeneveld's favor (giving it the benefit of all reasonable inferences) are that (1) Groeneveld's trade dress is strong, (2) the parties' products are related, and (3) the parties use similar marketing channels. But these latter factors standing alone do not raise a triable issue of fact regarding the likelihood of confusion in the absence of any evidence showing that a potential consumer exercising ordinary care

would confuse the grease pumps in question. In sum, no reasonable jury could conclude on the basis of the evidence before it that Groeneveld has met its burden of proving the likelihood of confusion.

**E.  Groeneveld's additional trade-dress theories**

Beyond the so-called "point-of-sale confusion," which has been discussed in Part II.D. above, Groeneveld claims that the Lanham Act protects against other kinds of confusion and harm as well. The additional theories put forth by Groeneveld are (1) initial-interest confusion, and (2) dilution.

### 1.  Initial-interest confusion

The usual focus of trademark law is on whether consumers are misled as to the source of the goods they purchase. But in certain circumstances trademark law protects against confusion even if it is ultimately dissipated before the moment of purchase. "Initial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 (6th Cir. 2005).

The following example demonstrates why protection against initial-interest confusion might make sense under the right circumstances: Suppose that you are taking a long roadtrip, you have become very hungry, and you are keeping an eye out for a McDonald's, which is your fast-food restaurant of choice. Soon you spot a "McDonald's" sign by an exit. You take the exit and follow the signs, looking forward to your favorite McDonald's hamburger. But—behold—it's a Burger King. The signs were misleading. You are not so fond of Burger King but, having already made the detour and loath to waste even more time, you reluctantly buy a Whopper and get on with your trip. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999) (using a similar example with video rental stores). One does not have to be an economist to see that such a deceitful creation of an initial interest is harmful to consumer interests, brand-development incentives, and efficient allocation of capital, even if the confusion is ultimately dissipated by the time of purchase.

But the circumstances of the present case do not remotely approach those of a paradigmatic initial-interest case.  To begin with, Groeneveld presented no proof as to how, in view of the two pumps' starkly different labels and logos, there would be any initial-interest confusion at all.  Nor does Groeneveld explain why, assuming that such initial confusion were to take place, it would not be instantly dissipated without any harm.  Simply invoking the term "initial-interest confusion" does not state a viable claim, let alone create a triable issue of fact.  This court has held that alleging a hypothetical chance that a consumer might think for an instant that two products come from the same source is simply not enough:

> Gibson essentially argues that the shape of the PRS guitar leads consumers standing on the far side of the room in a guitar store to believe they see Gibson guitars and walk over to examine what they soon realize are PRS guitars.  We decline to adopt such a broad reading of the initial-interest-confusion doctrine.  Many, if not most, consumer products will tend to appear like their competitors at a sufficient distance.  Where product shapes themselves are trademarked, such a theory would prevent competitors from producing even *dissimilar* products which might appear, from the far end of an aisle in a warehouse store, somewhat similar to a trademarked shape.

*Gibson Guitar*, 423 F.3d at 552 (emphasis in original) (internal citations omitted); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:9 ("Confusion means more than that the junior user's mark merely calls to mind the senior user's mark." (internal quotation marks omitted)).

In the final analysis, what appears to concern Groeneveld is not so much initial-interest *confusion*, but initial interest, period.  Groeneveld, in other words, simply does not want its customers to become interested in Lubecore as a potential competitor and possibly switch over.  We cannot ascribe any other interpretation to Groeneveld's rather startling claim that evidence of diverted sales and declining revenues, which are the normal signs of a market opening up to competition, create "a reasonable inference of confusion and its likelihood."  Groeneveld's desire to be the only game in town is perfectly natural; most companies would hope for that status.  But Groeneveld cannot get any help from trade-dress law in suppressing lawful competition.  *See TrafFix Devices*, 532 U.S. at 28 ("[P]rotection for trade dress exists to promote competition.").

## *2. Dilution*

Groeneveld's remaining Lanham Act argument is that Lubecore is responsible for diluting the former's brand image by introducing low-quality knockoffs into the market. Such dilution, Groeneveld argues, is harmful above and beyond the alleged harm caused by consumer confusion.

Under a dilution theory, a plaintiff's trade dress is protected against the kind of imitation that cheapens the genuine product by flooding the market with a mass of low-quality replicas, even if consumers do not ultimately confuse the fake with the real thing. *See Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1244-45 (6th Cir. 1991). Examples include the proliferation of fake Rolex watches or Ferrari look-alikes. *See Rolex Watch, U.S.A., Inc. v. Canner*, 645 F. Supp. 484 (S.D. Fla. 1986); *Ferrari*, *supra*.

Trade-dress dilution is actionable under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Groeneveld's grease-pump design, however, is neither nonfunctional nor "famous," which are both requirements of a dilution claim under that section. Moreover, Groeneveld's dilution claim is being raised for the first time on appeal. Neither the complaint nor the interrogatories submitted to the jury contain any references to 15 U.S.C. § 1125(c) or to a claim of dilution. Dilution is not just a new argument; it is a new cause of action. We therefore decline to further consider this new claim on appeal. *See* Fed. R. Civ. P. 15 (setting forth the procedure to be followed in order to amend a complaint to add a new claim); *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) ("In general, issues not presented to the district court but raised for the first time on appeal are not properly before the court." (brackets and internal quotation marks omitted)).

## F. Trade-dress summary

In sum, because Groeneveld failed to present sufficient evidence to enable a reasonable jury to find both that Groeneveld's product design is nonfunctional and that ordinary consumers would likely confuse its trade dress with Lubecore's, judgment as a matter of law should have been entered for Lubecore. We therefore reverse the district court's denial of Lubecore's

motion for judgment as a matter of law, set aside the jury's award of damages, and dissolve the injunction.

## III.  ANALYSIS OF GROENEVELD'S CROSS-APPEAL

### A.  Other claims

We now turn to Groeneveld's cross-appeal, which challenges the district court's decision to grant Lubecore's motion for judgment as a matter of law on counts 2-6 of the complaint.  These counts assert claims of unfair competition and false advertising, both in violation of 11 U.S.C. § 1125(a) (Counts 2-3); deceptive trade practices, in violation of Ohio Revised Code §§ 4165.02 *et seq.* (Count 4); unfair competition, in violation of Ohio common law (Count 5); and unlawful interference with contractual and business relationships, again in violation of Ohio common law (Count 6).  Groeneveld's primary argument is that its non-trade-dress claims should have survived summary disposition for the same reasons that its trade-dress claim survived.

But Groeneveld's claims of deceptive trade practices and unfair competition under the Ohio Deceptive Trade Practices Act (DTPA) and Ohio common law (Counts 4 and 5) were properly dismissed because they are coextensive with the federal trade-dress claim.  *See, e.g.*, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 288 (6th Cir. 1997) (holding that the plaintiff's Ohio DTPA and common-law claims "mirror the . . . federal claim of trademark infringement by also requiring proof of a likelihood of confusion").  The claim of unfair competition under 15 U.S.C. § 1125(a) (Count 2) properly met the same fate because it requires proof of either a likelihood of confusion or a misdesignation of origin, neither of which exists in the present case.  See Part II.D. above.

This leaves the claims of false advertising under 15 U.S.C. § 1125(a) and tortious interference under Ohio common law (Counts 3 and 6).  In support of these claims, Groeneveld points to Lubecore's "mimicking the EP0's external appearance" and its practice of offering to extend Groeneveld's warranty and to replace Groeneveld pumps and parts with Lubecore products.

The claim of "mimicking" has already been disposed of in the discussion of product-design copying in Part II.D.1. above. And the claim that Lubecore is at fault for targeting Groeneveld consumers is untenable. Groeneveld has cited no authority for the proposition that targeting the customers of one's competitor by extending a warranty program or offering the replacement of parts is unlawful. Nor is such a dearth of authority surprising. After all, one company's attempt to take customers away from another company in such a manner is the very essence of competition. Groeneveld's claim in this respect is exactly the kind of "anticompetitive strike suit" that is appropriate for "summary disposition." *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 214 (2000).

**B. Scope of the permanent injunction**

Finally, Groeneveld urges us to broaden the scope of the district court's permanent injunction to include Canada as well as the United States. This issue is moot because we have set aside the injunction altogether.

## IV. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court denying Lubecore's Rule 50 motion with respect to Groeneveld's trade-dress claim, **AFFIRM** the district court's dismissal of Groeneveld's other claims, and **REMAND** the case with instructions to enter judgment as a matter of law in favor of Lubecore on all claims.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting.  The majority's articulation of the "key issue" presented—"whether a company can use trade-dress law to protect its *functional product design* from competition with a 'copycat' design made by another company where *there is no reasonable likelihood* that consumers would confuse the two companies' products as emanating from a single source," Maj. Op. 1 (emphasis added)—frames this appeal in a manner that assumes the very issues to be considered—whether the trade dress is functional and whether there is a reasonable likelihood of confusion—without any acknowledgment that reasonable inferences to the contrary not only exist but were accepted by a jury and the district court.

I respectfully dissent because I do not agree that Groeneveld presented insufficient evidence for a reasonable jury to find in its favor on its trade-dress infringement claim. Moreover, although I agree with the majority as to the basic legal standards governing copyright, patent, trademark, and trade-dress law, my reading of the relevant precedents does not fully comport with the majority's interpretation and application of the law.

I would affirm the district court's judgment because Groeneveld presented sufficient evidence to support the jury verdict, the district court did not abuse its discretion in denying Lubecore's motion for a new trial or upholding the damages award, and the permanent injunction is appropriately limited to the United States.  Lastly, I would remand for the limited purpose of instructing the district court to provide on-the-record reasons for its dismissal of Groeneveld's federal unfair-competition claim, 15 U.S.C. § 1125(a); Ohio common-law unfair-competition claim; and Ohio deceptive trade practices act (ODTPA) claim, Ohio Rev. Code § 4165.02.

**I.**

Groeneveld's trade dress is the external shape and appearance of its EP0 grease pump (the Groeneveld pump), including its logo and color.  Groeneveld was the exclusive manufacturer of this style pump for decades, until Lubecore began selling a similar-shaped

pump.  The differences between the two pumps are the company logos and plates, and bands of color.  Although there was ample evidence to support a verdict for either party on Groeneveld's trade-dress infringement claim, the jury—after listening to testimony during a seven-day trial and considering numerous exhibits— found for Groeneveld.  Lubecore appeals, seeking reversal on the basis that Groeneveld failed to present sufficient evidence for a reasonable jury to find in its favor and that the district court abused its discretion in denying its motion for a new trial and upholding the damages award.

The law governing Lubecore's appeal is clear.  We must view the evidence in the light most favorable to Groeneveld, cannot reweigh the evidence, and owe substantial deference to the jury verdict.  *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).  The majority reweighs the facts in Lubecore's favor notwithstanding that Groeneveld proffered evidence supporting each element of its claim:  "(1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired 'secondary meaning,' thereby indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar."  *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006) (citation omitted).

## A.

Lubecore first attacks the district court's decision to deny its motion for judgment as a matter of law and a new trial on the basis that Groeneveld failed to prove non-functionality.  Whether a product feature is functional is a question of fact reviewed for clear error.  *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 681 (6th Cir. 2006).  The appropriate focus is the overall trade dress rather than each dissected component.  *See Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 658 (4th Cir. 1996) ("[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress *as a whole* is functional." (collecting case-law from the Second, Ninth, Tenth, and Eleventh Circuits for the same proposition)); *cf. Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 157 (6th Cir. 2003) (recognizing that "the district court was perhaps too categorical in summarily rejecting [the plaintiff]'s argument that the court had to

consider whether the overall configuration of the album was functional, rather than focusing exclusively on its component parts").

"In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 850 n.10 (1982). "Expanding upon the meaning of this phrase, [the Supreme Court] ha[s] observed that a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (last alteration in original) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)).

In *TrafFix*, the Supreme Court principally held that our court (which had reversed in part a district court's grant of summary judgment in favor of a competitor on the plaintiff's trade-dress claim) "gave insufficient recognition to the importance of the expired utility patents, and their evidentiary significance, in establishing the functionality of the [plaintiff's] device"—a dual-spring mechanism for keeping outdoor signs upright in adverse wind conditions. *Id.* at 32. The Court then reaffirmed that the *Inwood* formulation, *see* 456 U.S. at 850 n.10, is the main test to determine functionality, and held that this court had erred by inquiring into the competitive necessity of the design where the device was otherwise functional. 532 U.S. at 32–33. "Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33. The Court reasoned that the dual-spring design served more than the purpose of informing consumers that the sign stands were made by the plaintiff, but "provide[d] a unique and useful mechanism to resist the wind's force." *Id.* In other words, the design was "the reason the device work[ed]." *Id.* at 34.

Under *TrafFix*, the possibility of alternative designs cannot render a trade dress non-functional where it is otherwise functional under *Inwood*. *Id.* at 33. The majority has morphed this simple principle into a holding that evidence regarding the possibility of alternative designs is irrelevant to the determination whether a design is functional. *TrafFix*

does not so hold.[1] *See* 1 McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed. 2013) (explaining that *TrafFix* "d[oes] not [hold] that alternative designs cannot be considered as one source of evidence, along with others, in the initial determination under the *Inwood* engineering-driven formulation").

To be sure, "a court is not *required* to examine alternative designs when applying the traditional *Inwood* test for functionality" because "if a product is clearly functional under *Inwood*, a court need not apply the competitive-necessity test and its related inquiry concerning the availability of alternative designs." *Antioch Co.*, 347 F.3d at 156. Post-*TrafFix*, however, both this court and other courts have continued to consider the possibility, or lack thereof, of alternative, functionally equivalent designs as *one of several factors* in determining functionality. *See Fuji Kogyo Co.*, 461 F.3d at 685–86 (considering testimony that alternative designs would not be acceptable to consumers); *see also Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011); *id.* at 731 (considering argument about the availability of alternative designs, but concluding that the possibility of alternative designs cannot, on its own, render a design nonfunctional); *Au-Tomotive Gold, Inc. v. Volkswagen of Am.*, 457 F.3d 1062, 1072 n.8 (9th Cir. 2006) (noting that, following *TrafFix*, the court of appeals has reiterated that the possibility of alternative designs, among other factors, is a legitimate consideration in determining whether a product feature is functional); *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002) ("Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available." (internal footnote omitted)). Thus, I do not read *TrafFix* as standing for the unqualified proposition that inquiring about possible alternative designs is error under the *Inwood* formulation, although (as the district court properly instructed

---

[1] Nor does *TrafFix* hold that consideration of alternative designs is appropriate only in cases of "esthetic functionality."

the jury) the mere possibility of alternative designs does not render a design non-functional. *Gen. Motors Corp.*, 468 F.3d at 417; PID 8787.[2]

Applying the *Inwood* formulation, I disagree with the majority's conclusion that Groeneveld presented "no evidence" that its pump's overall design is non-functional. Groeneveld's vice president of design and production, Willem van der Hulst, agreed that the base optimized the amount of material in the pump for its internal workings. PID 7989. However, he did not say (as the majority infers) that the irregular shape of the base was necessitated based on the pump's internal components. Rather, he testified that the base was not "form fitted" around the internal parts, and he clarified that it is the weight of aluminum in the base that affects the cost. Van der Hulst added that the same amount of aluminum, if molded to a different shape, probably would not affect the cost of the aluminum but could affect "the cost of production to work the body," i.e., the "machine part" of the device. PID 7989–80, 8004–05. The appropriate inference to be drawn from this testimony is that the volume of aluminum or arrangement of the internal parts could impact the pump's function, but the irregular shape of the base is not essential to the pump's functioning and does not affect the cost of the device. As van der Hulst made clear, the pump would cost the same even with a different shape. PID 8005. Further, although the "inside volume" of the upper cylinder reservoir is determined by "something other than human design" because the reservoir volume affects the amount of grease the pump can hold, PID 7922, 7988, 8019, it is not apparent that the cylinder's shape is the reason the device works.

---

[2]As one commentator has reasoned:

> I cannot believe that the Supreme Court in *TrafFix* meant, in [a] back-handed way, to overrule decades of precedent which has used alternatives as another source of evidence to resolve the difficult puzzle of functionality. I think that, as a matter of policy, consideration of alternatives can assist expert witnesses (and judges) in reaching a sound opinion (or decision) as to why a shape is or is not "functional" under the *Inwood* test. More, not less, evidentiary light should be permitted to shine on the problem. In *TrafFix*, the Court said that the "principal question" to be decided was not the relevance of alternatives, but was the significance of the presence of the alleged trade dress features in a utility patent. It was this which created "strong evidence" of functionality in the *TrafFix* case.

1 McCarthy, supra, § 7:75 (capitalization of internal case names altered). Here, there is no utility patent that touts the utilitarian advantages of the Groeneveld pump's design.

In any event, the non-functional configuration of otherwise functional components does not compel a finding that a product's overall trade dress is functional as matter of law, and the majority's equation of such components adding up to an overall functional design is not the law.  Rather, "in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, *or* distinctive way." *Antioch Co.*, 347 F.3d at 158 (emphasis added).  The evidence supports a finding that the pump's overall configuration was designed to look distinctive in the industry rather than due to functional concerns.

First, evidence that the pump's outer appearance was not dictated by its internal functioning is sufficient.  Whether a product's design is "essential to the use or purpose of the article" or "affects the cost or quality of the article," *TrafFix*, 532 U.S. at 32–33 (emphasis added), is the appropriate inquiry.  In *TrafFix*, the Court emphasized that "[t]he point is that the springs are necessary to the operation of the device," "the dual-spring design provides a unique and useful mechanism to resist the force of the wind," and "[t]he dual-spring design is not an arbitrary flourish in the configuration of [the] product; it is the reason the device works." *Id.* at 30, 33, 34.  *Accord Antioch Co.*, 347 F.3d at 158 (explaining that "where engineering necessity influence[s] the configuration of the functional components," the resulting design is functional).

In *General Motors Corp.*, we concluded that the trade dress of a Hummer/Humvee vehicle—"the exterior appearance and styling of the vehicle design which includes the grille, slanted and raised hood, split windshield, rectangular doors, [and] squared edges"—was non-functional.  468 F.3d at 417.  Of course, a vehicle's grille, hood, windshield, doors and exterior edges serve particular functions as individual components of the vehicle, but their individualized *designs* on the Hummer/Humvee did not.  Here too, the Groeneveld pump's external appearance—the round and cylindrical shape of the clear reservoir, the grooves on the top and bottom of the reservoir, the particular placement of the product label and other features, and the irregular shape of the base—perform no *inherently* functional purpose.  That its individual components (or inside volume of those components) have functional qualities does not compel a finding that the trade dress is functional.

Second, van der Hulst's testimony—asserting that Groeneveld did not have to design its pump in the unique way it did—was not a bare denial as characterized by the majority:

> Q.  Did Groeneveld have to make its pump look this way on the outside because of the way it works on the inside?
>
> A.  No, no, of course not.  No, no.
>
> Q.  Well, again, you say of course not --
>
> A.  You can't -- the pump wasn't made in this way but you can put the valves inside.  You can make out of the pistons horizontal or vertical, make it horizontal. You can change the shape of the reservoir round you can make also reservoirs which are square.  So you can change very easily the same pump [would] function[] the same way.

PID 7920.

> A.  You see the reservoir on top?  This is a reservoir on top, yeah.  That is the container of the [grease].  The reservoir you can make in several dimensions, yeah.  You can make them in two kilos, three.  We're speaking kilos, okay.  This one which you see on the table [is a] six kilo grease container, and this has to do with the time you want to []come for the next . . . filling . . . .
>
> Q.  So the sizes of reservoir of ALS pumps vary then?
>
> A.  Yes, vary a lot, yeah.

PID 7922.

> Q.  Does the shape or outline of the pump affect the way the thing performs, the way it delivers grease throughout the system?
>
> A.  No.
>
> Q.  Explain this to the jury.  It might be obvious, but I'm sorry.  I'll ask you to explain.
>
> A.  It's like a car.  No?  The car go from A to B and they're all different.  **The shape has nothing to do with the function of the [car] moving from A to B, and it's the same as the lubrication system.  The only thing we have to do is create energy and that there is an outlet w[h]ere grease is coming out, how you do that, you can do it in many, many, many ways.**

PID 7947 (emphasis added).

Third, I disagree with the majority's rejection of van der Hulst's reference to the "commercial people." English is not van der Hulst's first language, which I believe the jury could have reasonably taken into account in assessing his testimony. Van der Hulst explained that the commercial people provide "information of what the market wants." PID 7920. The implication is that this company division is involved in design decisions from an aesthetic, rather than a functional, standpoint. He further testified:

> Q. Were the commercial people and the sales people at Groeneveld involved in the design of the EP-0 Groeneveld pump?
>
> A. Of course. We make -- we make **art impression** at that time. We make some sketches. **How it would look like**. I think we made even another model to show the pump to the people to management because there was money involved, and we needed to show what we are going to do. So they had an idea of the shape and the function is only -- yeah, telling how it will function. That's not too easy, but the shape we have to show it, yeah.

PID 7946–47 (emphasis added). A jury could infer that the design of the pump was a separate consideration from its internal functioning.

Fourth, van der Hulst explained in detail why the pump design is based on branding considerations and that the pump has a unique look in the marketplace:

> A. . . . [W]e were sure that this was the only possibility to make a pump which looks completely different than the other pumps at that time which were available because a lot of pumps were made with mechanical parts with bolts and screws and piece of steel, so on, and plastic. We wanted to make it different. One piece worked and finished.
>
> Q. Why did you want to make your pump different looking than everybody else's that was on the market?
>
> A. Yeah. It's just a challenge. It's a challenge of designer and each -- let's say you want to make something different than everybody else. . . .
>
> **So we want to give it a groove look.** So this has to be our pump for many, many years and has to be good and nice.
>
> Q. And was the Groeneveld EP-0 pump different looking than everybody else's on the market?
>
> A. At that time, yes. Yes, of course.

Q. And what about over the last 30 years?

A. We had a lot of success with this pump. Groeneveld went all over the world with this pump. We created a lot of distributors everywhere, and we were very successful with this pneumatic system, and we still are.

Q. Over the last 30 years, did anybody else's ALS pump look like Groeneveld's, other than what we have here on the table now?

. . .

[A.]     No, no.

Q. Did new products come on the market, ALS pumps over the last 30 years?

A. Yes, there is a lot of produce of lubrication pumps, lubrication system, Japanese, Chinese, also Europe, different producers, smaller ones, but they all have their own systems in a way, and they look all different, all different.

PID 7909–11 (emphasis added).

Q. You said that the Echo or the Sterk pump we were just looking at is a terrible pump. What's terrible about it?

A. Yeah, only the look. I have nothing to say about the quality because probably is a perfect pump, and so it's only the look which I mention, yeah.

Q. Was that -- was that important to you or a factor in the way you chose to engineer the Groeneveld pump way back in the way it looked, and not looking terrible and all those things you just described?

[A.]     Yeah, I think so because the Groeneveld was -- at that time, a very young company with young managers. Mr. Groeneveld, especially, he had very good choice. He like nice things. We had a nice office, nice cost, nice people. So we were different than the really old mechanical people. Let's say it in this way. We were a sales company, we did a lot of promotion, and there's a reason why we wanted to do something else[.]

PID 7923–24.

Q. Do you know this is a grease jockey pump?

A. A grease jockey pump.

Q. Meaning Exhibit 42?

A. Yeah.

Q. Would you have wanted to design and create, make something that looks like this?

A. No, they['d] fire me probably.

(Laughter.)

Q. And why, if it works, what does anybody care what it looks like?

A. You see nowadays the cars, even trucks, nowadays, new truck is nicer than a personal car inside. The shape on the cars, the wheels, the tire protection, the tanks, the air tanks, it's unbelievable nice. Not only a car would go from A to B. No, they want also to make something nice. So when you put something on a chassis of an owner of a truck with truck for a lot of money, he bought all kinds of chrome insulation, lights and nice things, and then you put this on the chassis. It's terrible, huh?

PID 7944–45.

Although the pump's trade dress is not an ornamental feature per se like certain components of luxury cars, an ALS pump can be a visible component of a truck. App. 323–35. And for the consumer, its unique look causes immediate brand recognition. PID 8199. Van der Hulst testified that, although it costs more to manufacture nowadays, the pump's overall appearance has remained the same since it was first produced in the 1980s because the industry associates it with Groeneveld. PID 7930–31, 8005–06.

*Leatherman Tool Group v. Cooper Industries*, 199 F.3d 1009 (9th Cir. 1999), does not support the majority's result. In *Leatherman*, the Ninth Circuit concluded that a competitor was entitled to judgment as a matter of law on Leatherman's trade-dress claim because the overall appearance of Leatherman's Pocket Survival Tool (PST) was functional. Applying the principle "that[,] in a product configuration case[,] there must be some aspect to the configuration which is nonfunctional," *id.* at 1013 n.6, the Ninth Circuit reasoned:

> . . . [T]here is no evidence in the record which supports the jury's conclusion that the overall appearance of the PST is protectable trade dress. To be sure, the PST has an appearance, as every physical object must. There is no evidence, however, that anything about that appearance (other than the Leatherman name) exists for any non-functional purpose. Rather, every physical part of the Leatherman is de jure functional. No witness pointed to any feature of, or marking on, the PST (other than the Leatherman name) which was ornamental or intended to identify its source. Rather, the evidence showed . . . that the

> product is in its particular shape because it works better in this shape. Indeed, the designer of the PST repeatedly testified as to his belief in the truth of Leatherman's claims as to the superiority of the PST design.
>
> . . . [Although the] trade dress must be viewed as a whole, . . . where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional.

*Id.* at 1013 (internal citation, quotation marks, and emphasis omitted). The Ninth Circuit also noted that "the evidence here was unequivocal that none of the alternative[] [designs] offered the same functionality as the PST." *Id.*

Unlike *Leatherman*, there was ample evidence that the Groeneveld pump's design was intended to identify its manufacturer and does in fact identify its manufacturer in the marketplace. Moreover, as discussed supra, van der Hulst's testimony supports a finding that the pump's design was based on aesthetic considerations, the shape does not dictate the pump's function, other designs would result in the same function, and the design does not result in superior performance or cost effectiveness.[3]

In sum, although the jury might have decided otherwise, there was sufficient evidence to support a finding that the Groeneveld pump's trade dress is not based on engineering or cost concerns, but was "selected for [its] distinctiveness." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1247 (6th Cir. 1991); *see Cybergun, S.A. v. Jag Precision*, No. 2:12-CV-0074, 2012 WL 4868104, at *5 (D. Nev. Oct. 11, 2012) (holding that an overall configuration serves a non-functional purpose when it identifies the product as a specific product made by a specific manufacturer), *aff'd*, --- F. App'x ----, No. 12-17640, 2013 WL 3770855 (9th Cir. July 19, 2013).

---

[3]The Ninth Circuit further stated that "the only reasonable conclusion is that the overall appearance of the PST is not protectable as trade dress, at least as against a competitor which clearly marks its own product with a distinct name and who uses distinct packaging." 199 F.3d at 1014. As the Ninth Circuit held that the only non-functional component of the PST was the product name, it noted the difference in product labeling and packaging to emphasize that Leatherman's competitor did not copy the one plausibly protected component of its trade dress. It did not reach a separate conclusion on the likelihood-of-confusion factor.

**B.**

Lubecore also asserts that there was insufficient evidence to submit the issue of secondary meaning to the jury. "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4 (1992). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs.*, 456 U.S. at 851 n.11. We consider seven factors to determine whether a trade dress has secondary meaning: "(1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Gen. Motors Corp.*, 468 F.3d at 418. "No single factor is determinative and every one need not be proven." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 312 (6th Cir. 2001). The secondary meaning of a plaintiff's trade dress must exist prior to a competitor's alleged infringement. *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989).

Except for consumer surveys, Groeneveld presented evidence supporting all the remaining factors that, if believed, support a jury's finding of secondary meaning. *Herman Miller*, 270 F.3d at 313, 315 (explaining that the absence of consumer surveys is not fatal to a create a triable claim). Consumer testimony established that the Groeneveld pump has been recognized by its appearance for many years. PID 4373, 4394, 8199. Even Lubecore's founder, Jan Eisses, conceded that the pump is recognizable by its shape, although he qualified that it "also" can be recognized by the name and label. PID 8729–30. There is no dispute that Groeneveld exclusively used its unique design for decades before Lubecore made a similar-shaped pump. As to advertising, the Groeneveld pump is "displayed clearly on all of [its] promotional materials" and "it is a predominant part of [the company's] corporate image." PID 8293–94 (testimony of Gail Wilson, Groeneveld's chief financial officer); *see* PID 8302–10 (Wilson explaining the investment in advertising that incorporates images of the pump); App. 371–79 (evidence establishing the company's significant trade show attendance).

The revenue from the sale of the Groeneveld pump is significant. PX 39 (sealed). There is no dispute that Groeneveld is an industry leader (and has been for quite some time), PID 8198, 8304, or that its pump is well known in this industry.

Finally, as the majority acknowledges, "[t]he similarities in the two pumps' appearance (excluding the labels), the fact that other manufacturers' pumps do not have a similar look, and the fact that Lubecore's founder used to be a Groeneveld employee constitute circumstantial evidence of an intent to copy." Maj. Op. 22. This evidence is strong; it is implausible that Lubecore's pump, by sheer coincidence, just happened to be manufactured with an identical shape as the Groeneveld pump. Evidence of intentional copying "is especially helpful to establishing secondary meaning because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Herman Miller*, 270 F.3d at 314 (internal quotation marks omitted).

> When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied.

*Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990), *as quoted in Herman Miller*, 270 F.3d at 314.

The record amply supports a finding that "the unique exterior design and shape of" the Groeneveld pump constitutes its trade dress and has acquired a secondary meaning, which makes it distinguishable from other ALS pumps. *Ferrari*, 944 F.2d at 1240.

**C.**

Turning to the last element, the majority concludes that Groeneveld failed to prove likelihood of confusion. We consider eight factors in determining whether the trade dresses of competing products present a likelihood of confusion: "1. strength of the plaintiff's [trade dress]; 2. relatedness of the goods; 3. similarity of the [trade dresses]; 4. evidence of actual confusion; 5. marketing channels used; 6. likely degree of purchaser care; 7. defendant's intent in selecting the [trade dress]; [and] 8. likelihood of expansion of the product lines." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985) (formatting altered).

Although the ultimate determination whether a set of facts establishes a likelihood of confusion is a legal conclusion subject to our de novo review, we have held that the issue of confusion is more appropriately resolved by the fact-finder, rather than by the court as a matter of law, when a case presents a factually-intensive close call and the factors are balanced. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 731, 733 (6th Cir. 2012).

The majority concludes that the "different branding of the two grease pumps and the high degree of care presumably exercised by the pumps' sophisticated consumers . . . compel the conclusion that, as a matter of law, Groeneveld has failed to carry its burden of raising a triable issue regarding the likelihood of confusion." Maj. Op. 22. The majority begins its analysis with a side-by-side comparison of the pumps: "The former is green with a large 'G' mark and says 'GROENEVELD'; the latter is red with a maple-leaf mark and says 'lubecore.'" *Id.* at 19. Because of the label/branding differences that appear on the pumps and in advertising, the majority finds that "no reasonable consumer would think that the two grease pumps belong to the same company." *Id.*

The similarity factor, however, "entails more than a simple side-by-side comparison of the [trade dresses] in question." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002). *Accord Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991) ("[I]t is axiomatic in trademark law that side-by-side comparison is not the test." (internal quotation marks omitted)). Instead, the trade dresses "must be viewed in their entirety and in context. A court must determine, in the light of what occurs in the marketplace, whether the [trade dress] will be confusing to the public when singly presented." *Homeowners Grp.*, 931 F.2d at 1109 (internal quotation marks and alterations omitted). This rule is "to account for the possibility that sufficiently similar [trade dresses] may confuse consumers who do not have both [trade dresses] before them but who may have a general, vague, or even hazy, impression or recollection of the other party's [trade dress]." *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997) (internal quotation marks omitted); *see AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) (confirming the "anti-dissection rule"). Record evidence supports a finding that the pumps look similar despite the different labels. PID 4393–94 (consumer testimony: "**Q.** Does

anything about that label tell you that it was manufactured at a facility different than where Groeneveld has its factory? **A.** No. It could be manufactured at the same place. I mean you look at the base and everything is pretty much the same.").

*Abercrombie & Fitch Stores v. American Eagle Outfitters*, 280 F.3d 619 (6th Cir. 2002), does not compel a different result. In *Abercrombie*, we affirmed the district court's grant of summary judgment for American Eagle Outfitters (AE) on Abercrombie & Fitch's (A & F) trade-dress claim related to its catalog design, reasoning that AE's catalog was, as a matter of law, not confusingly similar to the A & F Quarterly. We summarized the following differences between the two catalogs:  1) although A & F and AE use similar formats to display their goods, AE "puts significantly fewer garments on each page than A & F does and presents its clothes in a spare, as opposed to dense, fashion"; 2) AE "uses colorbars and design bars underneath almost all its garments, while A & F does so occasionally"; 2) "[t]he most striking visual difference between the catalogs lies in the photographs," given that "A & F makes extensive use of photographs depicting apparently college-aged people in often erotic or homoerotic poses," whereas AE's photographs presented "people of various ages in non-suggestive, often family-oriented situations"; 3) absent from AE's catalog "is the sort of campy sketchwork that dominates much of A & F's editorial content"; 4) AE's "makes sparing use of lifestyle editorial content," and its editorial subjects are "often radically different" from A & F's; and 5) each company displays its name and mark on nearly every page of its catalog. *Id.* at 646–47.

Given these differences, we reasoned that "[n]o rational trier of fact could conclude that the overall appearances created by the configuration of the two catalogs are similar" because they "contain too many significant dissimilarities, in terms of both style, layout, and content, along with the ubiquitousness of the producers' respective trademarks constantly indicating—on practically every page—the catalog's origin[.]" *Id.* at 647–48. *Abercrombie* thus does not hold that a distinction in labeling alone makes a competitor's trade dress, as a matter of law, not confusingly similar where it is otherwise an identical copy of the plaintiff's trade dress. Rather, *Abercrombie* reaffirms that we must examine the appearance of two products as a whole and in context.

The majority's second basis for discarding the jury verdict is the "high degree of care *presumably* exercised by" consumers of ALS pumps due to the price of such pumps. Maj. Op. 22 (emphasis added). Even when combined with label differences, this presumed fact does not compel, as a matter of law, the conclusion that there can be no likelihood of confusion. In *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, we affirmed the district court's judgment in favor of the Bourbon-distiller plaintiff in an infringement case where its competitor used a similar trade-dress element—a red dripping wax seal—on its tequila bottles. 679 F.3d 410, 414 (6th Cir. 2012). With respect to likelihood of confusion, we upheld the district court's finding that the similarity factor narrowly favored the plaintiff and should be given considerable weight, despite the fact that the competitor's product included a house mark, i.e., a product label "identifying the name of the manufacturer." *Id.* at 422–23. We approved the district court's finding that such label differences are not dispositive and rejected the proposition that our case-law "stand[s] for the proposition that the presence of a house mark always has significant weight in the similarity analysis[.]" *Id.* at 422; *see Therma-Scan, Inc.*, 295 F.3d at 634 ("The presence of [a] label on [a competitor's product] . . . does not eliminate the similarity between the [trade dresses]. Instead, this labeling diminishes the likelihood of confusion created by the comparable [trade dresses] and reduces the importance of this factor."). Further, we emphasized that the district court's finding was also supported by its reasoning that: (1) "testimony in the record indicate[d] that many consumers are unaware of the affiliations between brands of distilled spirits, and that some companies produce multiple types of distilled spirits"; and (2) unlike a claim based on a simple palming-off theory, "when the two products are related enough . . . one might associate with or sponsor the other and still use their own house mark." 679 F.3d at 422.

Moreover, we held that even though the factor of consumer care clearly favored the competitor, this factor was "not dispositive" to override the district court's findings because "[c]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable . . . to assume nonetheless that the seller is affiliated with or identical to the other party." *Id.* at 423 (internal quotation marks omitted). We summarized that the plaintiff's mark was "extremely strong"; the "most important *Frisch* factors" are similarity and strength of the mark; and the degree of consumer care, even though given substantial weight, could not overcome the

strength of the plaintiff's mark and the similarity (despite apparent labeling differences). *Id.* at 422, 424; *see* 4 McCarthy on Trademarks and Unfair Competition § 23:53 ("The majority view is that labeling or use of a word mark does not avoid what would otherwise be an infringing trade dress.").[4]

> Here, in denying Lubecore's motion, the district court found:

> [Although] Lubecore's label and color are different than Groeneveld's, there is sufficient evidence from which the jury could have concluded that the products were confusingly similar despite the difference in markings given the testimony regarding corporate mergers and acquisitions in the industry; the fact that many pumps bear multiple company names; and, the fact that labels may not be the brand identifiers relied on in this industry.

*Groeneveld Transp. Efficiency v. Lubecore Int'l*, No. 1:10-cv-702, 2012 WL 1142512, at *4 (N.D. Ohio Apr. 4, 2012).

The majority rejects these points (which are reiterated by Groeneveld on appeal) as irrelevant. To the contrary, facts that undermine presumed consumer care in differentiating between products are relevant to the overall analysis, and dissimilarities in the trade dresses based on labeling have less weight in the context of such industry-specific evidence. *See Maker's Mark Distillery*, 679 F.3d at 422.

Moreover, the majority errs in its conclusion that the record does not support a finding that labels are not the primary brand identifiers in the industry. PID 4251 ("[M]y last thing that I would say that I could tell them [(i.e., different pump models, namely the Bijur, Grease Jockey or EcoStar)] all apart is the label."), 8169 ("**Q.** There w[ere] questions about the labels and my question to you is how do you recognize the different pumps that are in your market? **A.** They all look much different than ours, than the Groeneveld pump. **Q.** Do you rely on the label to make that assessment? **A.** No."), 8201 ("**Q.** Do you identify it based on the label or some

---

[4] *Cf. Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 30 (1st Cir. 1989) ("[F]ew would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts."); *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 364–65 (6th Cir. 1984) ("It has been observed that the expertise of purchasers does not always assure the absence of confusion. . . . Being skilled in their own art does not necessarily preclude [consumers from] mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field." (internal quotation marks omitted)).

other feature that is visible to you?  **A.** No.  As far as the label, no, I wouldn't.  The -- it's more of the -- it's just more of the design of it again."); 8238 ("The core element of the brand identification is the design of the product itself and then it's [sic] labeling and the green color and the identification plate.").[5]

Lubecore is a new company with a minimal brand recognition in the United States.  This fact is relevant because it undercuts the weight placed on the different brand labeling; even a sophisticated consumer cannot be expected to recognize brands that have little name recognition or have been in existence only a short time.  PID 8129–30 (testimony of independent distributor about his first encounter with a Lubecore pump:  "I really didn't know what was going on. I was shocked to see that it looked that close.  Again, it looked to me like they had taken a decal of the Lubecore and put it over the top of a Groeneveld pump, and I've known these pumps for a long time and I mean looking at it, it was identical. . . . I didn't know there was such a thing as Lubecore, and this looked like the Groeneveld product.").  Further, the lack of brand recognition undermines the weight the majority accords to the lack of evidence of actual confusion.  *See Maker's Mark Distillery*, 679 F.3d at 423 (placing little weight on the lack of evidence of actual confusion where the competitor's product was sold for a short time and in limited quantities).

Like the majority, I now turn to consider all of the *Frisch* factors to conduct an overall assessment.

### 1.  Lubecore's intent in copying Groeneveld's trade dress

I agree with the majority insofar as it holds that "[i]ntentional copying . . . is not actionable under the Lanham Act absent evidence that the copying was done with the intent to derive a benefit from the reputation of another."  *Ferrari S.P.A.*, 944 F.2d at 1243 (internal quotation marks omitted).

---

[5]The majority opines that the "most that the cited testimony shows is that certain witnesses were able to distinguish Groeneveld's pumps from pumps other than Lubecore's without even looking at the labels, which says nothing about whether a consumer would be able to distinguish a Groeneveld pump from a Lubecore pump with the labels." Maj. Op. 21.  But evidence that ALS pumps are identified based on the overall design rather than the label does, indeed, say something about whether consumers would be able to distinguish a Groeneveld pump from a Lubecore pump based on the labels alone where they are otherwise similar; it supports the inference that labels are not necessarily indicative of the product's manufacturer as the consumer's focus in this industry is on the design.

> [However, i]f a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity. Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user. Direct evidence of intentional copying is not necessary to prove intent.

*Daddy's Junky Music Stores*, 109 F.3d at 286 (internal quotation marks and citations omitted); *see Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 149 (4th Cir. 1998) ("[C]ourts have almost unanimously presumed a likelihood of confusion upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress."); *Frisch's Rest.*, 670 F.2d at 648 (explaining that "[t]he intent of [a party] in adopting [another's trade dress] is a critical factor" (internal quotation marks omitted)); *Ferrari S.P.A.*, 944 F.2d at 1243 (placing weight on the "presumption of likelihood of confusion that follows from intentional copying").

I also agree with the majority that copying is not per se illegal and that evidence of intentional copying is not necessarily dispositive of the likelihood-of-confusion analysis. For example, we have held that a plaintiff could not rely this factor where the plaintiff's mark was not strong and the competitor's alleged copy was not very similar to the plaintiff's trade dress. *Gray v. Meijer, Inc.*, 295 F.3d 641, 650–51 (6th Cir. 2002). Although "a presumption of intent to confuse arises when evidence of copying is presented," courts "recognize that if there is no real issue of a likelihood of confusion [due to the lack of evidence supporting other factors], evidence of copying is of no import." *Id.* at 651 (internal quotation marks omitted)

However, unlike the majority, I do not read these precedents—or the broader policy implications underlying the roles of copyright and patent law versus trademark law—to mean that Lubecore's intent to copy is "of no help" to Groeneveld. Eisses's testimony established that: 1) he instructed Martin Vermeulen (another former Groeneveld employee) to make a pump for Lubecore, and told him what he "like[d] about the Groeneveld pump and other pumps in the industry"; 2) the Lubecore pump looks similar to the Groeneveld pump; 3) "Groeneveld is recognized" in the industry and certain versions of its pump have a good reputation; 5) he would prefer that the Lubecore pump not look like the pump of a company with a bad reputation; 6) the Lubecore website says it takes twenty years to build a reputation and that it

would matter to him if the Lubecore pump looked like a Groeneveld pump if Groeneveld had a bad reputation; and 7) he could identify a Groeneveld pump by the shape of it, but then qualified "also because the name and the labeling on it." PID 8725–30.

Eisses further testified on cross-examination:

Q.  So, sir, you wanted it to look like the Groeneveld because you knew about Groeneveld's reputation, market presence, and place in the industry, didn't you?

A.  I have no objection with it looking like a Groeneveld.

**Q.  In fact, you like that, and you like enjoying the benefits of that, don't you?**

**A.  It's a good pump.**

Q.  Otherwise, you would make it differently, wouldn't you?

A.  It would have been up to Martin.

PID 8730 (emphasis added).

Eisses's answers on cross-examination are compelling circumstantial evidence that Lubecore intentionally copied the Groeneveld pump to benefit from Groeneveld's established reputation, which under our case-law supports the inference that Lubecore sought to confuse consumers.  In addition, Lubecore's extended warranty program also specifically targets Groeneveld customers and products, offering that "Lubecore will extend your current Groeneveld grease warranty from five years to the Lubecore six years" and that "Lubecore will honor the replacement of parts under the Groeneveld warranty from the original date of purchase." PID 8690.  Lubecore represents to Groeneveld consumers that if they use Lubecore grease, Lubecore will extend the warranty on the Groeneveld pump.  (Eisses testified that Lubecore would typically replace the Groeneveld pump with a Lubecore pump if something went wrong with a component of the Groeneveld pump). PID 8692–93.  Groeneveld is the only competitor targeted by Lubecore's warranty program.  PID 8693–94.  Drawing all inferences in Groeneveld's favor, Lubecore's marketing practices also support the inference of its intent to cause confusion among consumers in associating the two pumps, as an unaffiliated company normally does not (and cannot) extend another company's warranty.

In any event, even if the record were devoid of evidence supporting the intent factor, the majority incorrectly concludes that the absence of intent "cautions against allowing the issue [of confusion] to go to the jury" and "weigh[s] in Lubecore's favor." Maj. Op. 31, 34. Our case-law instructs:

> [E]ven if the [d]istrict [c]ourt correctly had ruled as a matter of law that defendant did not copy plaintiff's marks intentionally, the [d]istrict [c]ourt misunderstood the legal significance of this lack of intent by finding that it decreased the likelihood of consumer confusion. As noted, the presence of intent can constitute strong evidence of confusion. The converse of this proposition, however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source. Intent therefore is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer.

*Daddy's Junky Music Stores*, 109 F.3d at 287 (internal quotation marks and citations omitted).

## 2.    Strength of Groeneveld's trade dress

The majority acknowledges that "th[e] evidence is sufficient to support a factual finding that Groeneveld's trade dress is strong." Maj. Op. 32. The majority, however, opines that "such a finding is of no help to Groeneveld in the absence of any evidence that consumers are likely to confuse the source of the competing grease pumps." *Id.* But a finding that Groeneveld's trade dress is strong *is evidence* that bears on the overall likelihood-of-confusion assessment. Our precedents instruct that the strength of Groeneveld's trade dress is significant to that assessment. *See Maker's Mark Distillery*, 679 F.3d at 424 ("[W]e have said that the 'most important *Frisch* factors' are similarity and strength of the mark[.]" (quoting *Gray*, 295 F.3d at 646)).

## 3.    Relatedness of the goods

The majority also acknowledges that "[t]he parties do not dispute that Groeneveld's and Lubecore's grease pumps perform the same function and directly compete in the industry." Maj. Op. 32. But once again, the majority repeats its error by stating "[s]o this factor would also favor Groeneveld if it had any proof of the likelihood of confusion." *Id.* To the contrary,

under *Frisch*, this factor bears on the overall assessment whether there is a likelihood of confusion.

**4.     Similarity of the trade dresses**

Despite the fact that the shapes of the two pumps are virtually identical, the majority finds that this factor weighs "heavily" against Groeneveld because of the different labels. As discussed supra, there is no clear error in the district court's finding that different labels did not render the products dissimilar given other industry-specific evidence. This factor, at minimum, narrowly favors Groeneveld.

**5.     Evidence of actual confusion**

The majority acknowledges that the lack of evidence of actual confusion is not dispositive to this analysis. *See Maker's Mark Distillery*, 679 F.3d at 422 (explaining that a lack of evidence of actual confusion "is rarely significant," and upholding the district court's finding that the lack of such evidence was non-determinative); *Frisch's Rest., Inc.*, 759 F.2d at 1267 (explaining that "proof of actual confusion is not necessary"). Thus, a reasonable jury could find for Groeneveld in the absence of this factor, depending on the evidence, or lack thereof, supporting the other factors.

**6.     Marketing channels used**

I agree with the majority that "[t]he record contains evidence that both parties often attended the same industry trade shows, that they marketed their products over the Internet, and that certain distributors sold both parties' ALS systems. Such evidence is sufficient to show that there is a commonality in how the ALS systems are marketed." Maj. Op. 33–34. Unlike the majority, however, I do not consider such evidence inconsequential, especially in conjunction with the visual similarity of the trade dresses and weight of the other factors. *See Homeowners Grp., Inc.*, 931 F.2d at 1110 (explaining that "[t]his factor is very significant in illuminating what actually happens in the marketplace and, where other factors are not particularly probative, is of special importance," but that other facts, such as dissimilarities, may lessen the possibility of confusion).

**7.        Likely degree of purchaser care**

I cannot agree with the majority's assessment that this factor "strongly favors Lubecore" because, as discussed supra, Groeneveld presented evidence that undermines the presumption of consumer care. Drawing inferences in Groeneveld's favor, this factor, at most, only slightly favors Lubecore. In any event, as already discussed, this factor is not dispositive.

**8.        Likelihood of market expansion**

We have explained:

> A strong possibility that either party will expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing. A geographic expansion or an increase in the types of products or services offered can be relevant. A finding that the parties will not expand their markets significantly, however, does not address the ultimate issue of likelihood of confusion.

*Daddy's Junky Music Stores*, 109 F.3d at 287 (internal quotation marks, citations, and alteration brackets omitted). Witnesses for both parties testified that there was potential for growth in the United States. PID 8244–45 (Jennifer Wolfe, IP lawyer and consultant), PID 8589 (Eisses: "[W]e have plans to move into the United States and to build a company. It's a big opportunity. The market is ten times as large as Canada.").

**9.        Summary**

Except for the lack of evidence of actual confusion, and even weighing the consumer-care factor in Lubecore's favor, the remaining factors either favor Groeneveld or are neutral. Moreover, even under the majority's weighing of the factors, there is a three-to-four split which militates in favor of a jury determination rather than a ruling as a matter of law. *Innovation Ventures*, 694 F.3d at 733 ("[W]hen the factors, as found by the district court, were so evenly balanced—a 4 to 3 split, with the eighth factor not at issue in this case—precedent counsels in favor of not granting summary judgment."). On this record, a reasonable jury could find that the Lubecore pump is likely to confuse consumers.

**D.**

Lubecore raises various challenges to the jury's damages award.  Its arguments were rejected by the district court in a well-reasoned opinion, *see Groeneveld Transport Efficiency*, 2012 WL 1142512, at *4–5, and I discern no basis to hold that the district court abused its discretion in finding the jury award reasonably supported.  *See Advance Sign Grp., LLC v. Optec Displays, Inc.*, --- F.3d ---- , No. 12–3321, 2013 WL 3491277, at *7 (6th Cir. July 15, 2013)  ("Our review of a jury's damage award is extremely deferential, and we will not order a remittitur or new trial unless the award is contrary to all reason.").

**II.**

I now turn to Groeneveld's cross-appeal.

**A.**

Groeneveld challenges the district court's decision to grant Lubecore's motion for judgment as a matter of law (made before the case was submitted to the jury) on its federal unfair-competition, Ohio common-law unfair-competition, and ODTPA claims.[6]  The district court provided no explanation for its dismissal of these claims, beyond opining:  "I've listened to everything, believe me."  PID 8763.  Both in Lubecore's oral trial motion and on appeal, its argument urging dismissal of these claims is coextensive with its argument that insufficient evidence supported Groeneveld's trade-dress infringement claim.

Because it is unclear from the record why Groeneveld's remaining claims were dismissed, I would remand.

**B.**

Groeneveld urges this court to broaden the scope of the district court's permanent injunction to include Canada.  I do not find this issue moot because, unlike the majority, I would not dissolve the injunction.  Nevertheless, it is without merit.

---

[6]Because Groeneveld abandons its other claims, I deem those waived.

The district court did not expressly address Groeneveld's request for the injunction to proscribe conduct in Canada but limited relief to Lubecore's infringing conduct in the United States. To establish whether "circumstances call for extraterritorial application of the Lanham Act," courts have traditionally considered: "(1) whether the defendant's conduct has a substantial effect on commerce in the United States; (2) whether the defendant is a citizen of the United States; and (3) whether there exists a conflict between defendant's trademark rights established under foreign law, and plaintiff's trademark rights established under domestic law." *Libbey Glass, Inc. v. Oneida Ltd.*, 61 F. Supp. 2d 720, 722 (N.D. Ohio 1999) (citing *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 641 (2d Cir. 1956)); *see Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952) (holding that federal courts have jurisdiction to apply the Lanham Act extraterritorially).

Lubecore is not a U.S. citizen but a Canadian corporation, which weighs heavily against extraterritorial application of the Lanham Act. *See Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F. Supp. 220, 227 (S.D.N.Y. 1997). On the other hand, the parties agree that there is no conflict with foreign law (as Lubecore has no claim to the trade dress in Canada) and thus there would be no interference with Canadian sovereignty if the Lanham Act were applied against Lubecore in Canada.

Groeneveld's central argument is that Lubecore's Canadian activities have a substantial effect on United States commerce, but its discussion rests on speculation—that it is "likely" that Canadian trucks with installed Lubecore pumps will cross in and out of the United States and that Lubecore pumps marketed and sold in Canada are "likely" to affect sales and Groeneveld's reputation in the United States. Even if (as Groeneveld asserts) U.S. consumers can access Lubecore's web sites and order products online, that does not prove that Lubecore's Canadian activities have a substantial effect on domestic commerce. Although it is true that Eisses desired to expand his business in the United States, Groeneveld's assertion that Lubecore's strategy is to "lay the groundwork in Canada for expansion into the U.S." presupposes that Lubecore will violate the district court's injunction and is unsupported by record evidence. The most Groeneveld has shown is the possibility that Lubecore's foreign

activities might impact commerce in this country, but that is not enough to extraterritorially apply the Lanham Act.

## III.

For these reasons, I dissent.